# United States Court of Appeals
## For the First Circuit

No. 21-1931

GRACE MURRAY; AMANDA ENGEN; STEPHEN BAUER; JEANNE TIPPETT; ROBIN
TUBESING; NIKOLE SIMECEK; MICHELLE MCOSKER; JACQUELINE GROFF;
HEATHER HALL, on behalf of themselves and all others similarly
situated,

Plaintiffs, Appellees,

v.

GROCERY DELIVERY E-SERVICES USA INC., d/b/a HelloFresh

Defendant, Appellee,

SARAH MCDONALD,

Objector, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Kayatta, and Gelpí,
Circuit Judges.

Eric Alan Isaacson, with whom C. Benjamin Nutley was on brief,
for appellant.
Stacey Slaughter, with whom Brenda L. Joly, Marcus A. Guith,
Robins Kaplan LLP, Anthony I. Paronich, Samuel J. Strauss, and
Turke & Strauss LLP were on brief, for appellees Grace Murray,
Amanda Engen, Stephen Bauer, Jeanne Tippett, Robin Tubesing,
Nikole Simecek, Michelle Mcosker, Jacqueline Groff, and Heather

Hall.

Shannon Z. Petersen, with whom Karin Dougan Vogel and Sheppard, Mullin, Richter & Hampton LLP were on brief, for appellee Grocery Delivery E-Services USA Inc.

---

December 16, 2022

---

KAYATTA, **Circuit Judge**.   We consider in this case a challenge to the approval of a class-action settlement under Federal Rule of Civil Procedure 23(e).   For reasons we will explain, we vacate the approval because the absence of separate settlement counsel for distinct groups of class members makes it too difficult to determine whether the settlement treated class members equitably.   We also hold that incentive payments to named class representatives are not prohibited as long as they fit within the bounds of Rule 23(e).

## I.

HelloFresh is a subscription service that ships a recipe and ingredients for a meal to your doorstep.   In 2015, HelloFresh initiated a so-called "win back" marketing campaign, in which it used telemarketing contractors to contact former subscribers in an attempt to win them back as customers.   Plaintiffs in this class action allege that this marketing campaign violated the Telephone Consumer Protection Act (TCPA) in three different ways: (1) by using an automated dialer to place marketing calls to some people, 47 U.S.C. § 227(b)(1)(A); (2) by calling some people listed on the National Do-Not-Call (NDNC) registry, 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2); and (3) by calling some people who had requested that HelloFresh not call them (and therefore were required to be on HelloFresh's federally mandated internal do-not-call (IDNC) list), 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d).

We will call those three claims, respectively, the Auto-Dialer claim, the NDNC claim, and the IDNC claim.

After litigation commenced, HelloFresh entered mediated settlement discussions with the named plaintiffs. In the settlement negotiations, plaintiffs' counsel acted jointly on behalf of all prospective class members possessing one or more of the three potential claims arising out of HelloFresh's "win back" campaign. The parties eventually arrived at a proposed settlement conditioned on court approval. The district court preliminarily approved the settlement, pursuant to which HelloFresh agreed to pay $14 million to a settlement class. For purposes of the settlement only, see Fed. R. Civ. P. 23(e), the district court certified a single class, with no subclasses, consisting of about 4.8 million customers and former customers defined as follows:

> All persons in the United States from September 5, 2015 to December 31, 2019 to whom HelloFresh, either directly or by a vendor of HelloFresh, (a) placed one or more calls on their cellphones via a dialing platform; (b) placed at least two telemarketing calls during any 12-month period where their phone numbers appeared on the NDNCR for at least 31 days before the calls; and/or (c) placed one or more calls after registering the landline, wireless, cell, or mobile telephone number on HelloFresh's Internal Do-Not-Call List.

Email notice to 4.4 million class members and post card notice to 400,000 class members ensued. Approximately 100,000 class members submitted valid claims, while 270 opted out. Under

the settlement as preliminarily approved, each class member who submitted a valid claim would have received about $89 (net of proposed counsel fees and expenses).

Three individuals filed objections. One contended that HelloFresh should pay nothing. Another asserted that class members were not being paid enough. The third objector -- Sarah McDonald, appellant here -- filed the most substantial objections. McDonald explained why she viewed the $14 million payout as too small compared to potential statutory damages of over $2.4 billion. She argued that no single lawyer or group of lawyers could adequately negotiate and recommend a settlement jointly on behalf of three subgroups having materially different claims. As a result, she contended, the settlement sold out class members who were on the NDNC registry -- whose claims she says are the most valuable -- by placing them on equal footing with members in the other two groups, whose claims she says are virtually worthless. McDonald also objected to the use of incentive awards for the named plaintiffs. Finally, she contended that class counsel were getting too much of the pie, that the settlement should add restrictions on HelloFresh's future use of phone calls, and that class counsel failed to support their claim for litigation expenses.

On the first day of the final approval hearing on May 11, 2021, the district court gave McDonald's counsel and plaintiffs' counsel time to discuss each of McDonald's objections. After

argument, the court stated that the objections were "most respectfully taken into account" and that it had not yet determined how they would "work their way into the Court's final order." The court independently asked counsel to brief whether the settlement protected the class from being subject to "an anticonsumer mandatory arbitration clause."

At a follow-up hearing on June 9, 2021, the court rejected the settlement because of the arbitration issue. It explained that it would approve the settlement if HelloFresh would not require the arbitration of any future claim by any class member, to ensure that "HelloFresh will not, in the future, use a consumer mandatory arbitration clause as a cover." The court did not express any concerns about the amount of the settlement fund.

The parties then submitted an amended settlement agreement that addressed the court's arbitration concerns. Under the amendment, HelloFresh agreed that it would not seek to compel arbitration of future TCPA claims that class members might bring. On the final day of the hearing, September 29, 2021, the district court began by stating that each class member submitting a claim should receive more of the settlement award -- $100 rather than $89. This was in line with one of McDonald's concerns. The district court explained that this change would reduce class counsel's share from about 33% to about 25.5%. After HelloFresh and class counsel agreed to the adjustment, the district court

approved the settlement as "fair, adequate, and reasonable." Although the court explained that it had "noted and indeed in slight measure t[ook] into account [the] objections," it did not provide detailed reasoning for rejecting most of the objections. The court decided to "adopt [the settlement agreement] with a payout to each claimant of $100 and the attorneys' fees," and it entered an order and judgment on October 15, 2021, certifying the proposed class for purposes of a settlement and approving the proposed settlement.

McDonald timely appealed the approval of the settlement.

**II.**

The "approval or rejection of a class-action settlement is entrusted to the district court's informed discretion" and is accordingly reviewed "for abuse of that discretion -- a multifaceted standard under which we scrutinize embedded legal issues de novo and factual findings for clear error." Cohen v. Brown Univ., 16 F.4th 935, 946 (1st Cir. 2021) (citing Robinson v. Nat'l Student Clearinghouse, 14 F.4th 56, 59 (1st Cir. 2021)).

McDonald's principal argument below and on appeal rests on the contention that persons like her who signed up on the NDNC registry had materially stronger and more valuable claims than other class members without NDNC claims. Therefore, she reasons, it was inadequate for these groups to be represented by the same counsel in determining whether and to what extent their shares of

the settlement proceeds should differ.  And she contends that this unfair process led to an inequitable result in which all class members received equal shares, even though some had more valuable claims.  McDonald also raises a separate argument that the inclusion of incentive awards for the class representatives rendered the settlement defective.  We discuss these arguments in turn.

**A.**

We analyze adequacy of representation through the lens of Rule 23(e) for the purposes of this appeal, although much, if not all, of our analysis would apply to Rule 23(a)'s adequate representation requirement in the context of class certification for settlement.  See Cohen, 16 F.4th at 945 (stating that, because Rule 23(e)(2)(A) "overlaps with other requirements imposed by Rule 23, we look to case law glossing the stipulation that 'the representative parties will fairly and adequately protect the interests of the class'" in Rule 23(a)(4) (internal citation omitted)).

Rule 23(e) requires district courts to consider certain factors in determining whether a proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  These factors include procedural checks: that "the class representatives and class counsel have adequately represented the class" and that "the proposal was negotiated at arm's length."  Fed. R. Civ.

- 8 -

P. 23(e)(2)(A)-(B). They also include substantive checks: that "the relief provided for the class is adequate" and that "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)-(D); see Cohen, 16 F.4th at 943-44 (noting that "[t]he Advisory Committee explained that the first two factors are 'procedural' in nature," while "the latter two factors guide 'a "substantive" review'").

We train our attention in the first instance on the procedural checks because they provide assurance that the settlement resulted from a process likely to achieve a fair outcome, thereby providing "an important foundation for scrutinizing the substance of the proposed settlement." Fed. R. Civ. P. 23(e)(2)(A)-(B) advisory committee's note to 2018 amendments. In particular, the adequate representation inquiry "'serves to uncover conflicts of interest between named parties and the class they seek to represent.' Such conflicts undermine the indispensable 'structural assurance of fair and adequate representation for the diverse groups and individuals affected' by the class-action litigation or settlement." Cohen, 16 F.4th at 945 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625, 627 (1997)).

In the class settlement context, conflicts sometimes arise because there is a common fund -- i.e., an aggregate proposed settlement amount covering all claims -- that must be allocated

among class members.  In these zero-sum circumstances, a benefit to one group of class members (in the form of a larger portion of the common fund) comes at the detriment of the other class members (who receive a smaller portion as a result).  This presents a concern that the class representatives or class counsel may "have sold out some of the class members" by allocating some of their fair share to other class members.  4 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 13:56 (6th ed., June 2022 update).  Therefore, adequate representation in the settlement context sometimes requires separate representation for groups of class members with differing interests.

Not all conflicts require separate representation, however.  "The standard . . . is not 'perfect symmetry of interest' among the class."  Cohen, 16 F.4th at 945 (quoting Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012)).  Rather, because "[t]he perfect is sometimes the enemy of the good," only those conflicts that "are fundamental to the suit and . . . go to the heart of the litigation" breach the adequacy-of-representation standard.  Id. at 945–46 (quoting Matamoros, 699 F.3d at 138).  "Put another way, . . . the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole."  Matamoros, 699 F.3d at 138.  On the other hand, "intra-class conflict is unacceptable when it presents an

actual and substantial risk of skewing available relief in favor of some subset of class members." Cohen, 16 F.4th at 950.

Whether potential differences in claim value give rise to conflicts requiring separate representation turns on the nature of the differences between the claims. Class actions in which all class members have materially common claims are unlikely to require separate representation. See, e.g., Hanlon v. Chrysler Corp., 150 F.3d 1011, 1021 (9th Cir. 1998). In such cases, any differences in claim value would likely be subject to objective calculation, or so obviously miniscule that the transactional costs of debating them would outweigh any resulting incremental increases in fairness. Therefore, such differences would be unlikely to "overbalance the common interests of the class members as a whole" in obtaining the largest settlement possible without running up transaction costs. Matamoros, 699 F.3d at 138.

By contrast, if "easily identifiable categories of claimants," Ortiz v. Fibreboard Corp., 527 U.S. 815, 832 (1999), have significantly different claims, or if their claims are subject to significantly different defenses, the lack of separate representation "presents an actual and substantial risk of skewing available relief in favor of some subset of class members," Cohen, 16 F.4th at 950. Significant differences in contested claims or defenses have the potential to cause significant differences in claim value, which should be reflected in any fair settlement.

See, e.g., Principles of the L. of Aggregate Litig. § 3.05 cmt. b (Am. L. Inst. 2010) ("[A]n agreement that gives the same monetary remedy to all members of the class, despite significant differences in the nature of their claims . . ., may not be fair and reasonable."). Therefore, any such significant differences should factor into negotiations regarding allocation of the settlement among groups of class members. And if each group of similarly situated class members participates in those negotiations through counsel owing allegiance only to that group, the court has some structural assurance that a negotiated agreement accounts for any differences between the claims.

That structural assurance is absent when a single lawyer represents groups with significantly different claims in the context of allocating a lump-sum settlement. It is unreasonable to expect such a lawyer to properly advocate for each such group because giving one group a larger piece of the pie necessarily reduces the amount available to a different group. Id. § 2.07 cmt. d ("Structural conflicts also might arise from easily identifiable differences in the claims to be aggregated, such that a common lawyer could not reasonably advance the interests of all claimants."). Such a lawyer would be limited in advancing the best arguments in favor of one claim relative to another because of the lawyer's duties to class members holding the latter claim. Cf. Model Rules of Pro. Conduct r. 1.7(a)(2) (Am. Bar Ass'n 1983)

(stating that a conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client"). Therefore, if groups of class members with significantly different claims do not have separate representation in determining how the settlement should be split, the court lacks structural assurance that the settlement treats each group fairly. See In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242, 253 (2d Cir. 2011) ("[H]ow can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?").

For example, in Literary Works, the Second Circuit considered a settlement of $18 million divided among class members holding three different categories of claims under the Copyright Act. Id. at 246. Depending on the status and timing of registration of the works at issue, the claims were (A) eligible for statutory damages and attorneys' fees; (B) eligible only for actual damages and profits of the infringer; or (C) potentially eligible for actual damages and profits of the infringer (depending on whether the works were registered). Id. The Second Circuit held that this breakdown required separately represented subclasses because "[t]he selling out of one category of claim for another [was] not improbable." Id. at 252. Accordingly, "[o]nly the creation of subclasses, and the advocacy of an attorney

- 13 -

representing each subclass, [could] ensure that the interests of that particular subgroup [were] in fact adequately represented."
Id.

Superficially, it might seem that all class members in this case share a common claim: they all allege that a telemarketing campaign conducted by HelloFresh violated the TCPA, 47 U.S.C. § 227. The TCPA, however, does not create a single cause of action. Rather, it authorizes suit and recovery for a variety of quite different acts.

For example, NDNC claims are based on one prong of the TCPA and its implementing regulations applying only to telephone calls made to residential telephone subscribers who are on a national do-not-call list. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). The elements of such a claim are: (1) a residential telephone subscriber (2) received more than one telephonic solicitation (3) by or on behalf of the same entity (4) during a twelve-month period (5) to a number that the subscriber registered on the NDNC registry. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). By contrast, an Auto-Dialer claim arises under a different section of the TCPA, and only if: (1) at least one call is made (2) using an automatic telephone dialing system (3) without consent of the called party and not for emergency purposes (4) to a number assigned to certain types of telephone services. 47 U.S.C. § 227(b)(1)(A)(iii).

Yet a third type of claim, the IDNC claim, arises if (1) a residential telephone subscriber (2) receives more than one call for telemarketing purposes (3) by or on behalf of the same entity (4) during a twelve-month period (5) within five years of asking the entity not to call them.  47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d).  While the elements of this claim are similar albeit not identical to those of the NDNC claim, there is an "established business relationship" defense to NDNC claims that does not apply to IDNC claims.  47 C.F.R. § 64.1200(f)(5), (15).

Each of these three types of claims is represented among the class members, and some class members have multiple types of claims.  In addition, HelloFresh has raised a smattering of defenses to these claims.  Two of its defenses apply to all three categories of claims: that HelloFresh is not liable because the calls were made by third-party vendors, and that an arbitration clause and a class-action waiver in HelloFresh's terms and conditions preclude class certification.  The rest apply to fewer than all three categories.  HelloFresh's argument that the machine that made the calls was not an "automatic telephone dialing system" applies only to the Auto-Dialer claims.  Its argument that its calls were not "telephone solicitations" because it had an "established business relationship" with its former customers, see 47 C.F.R. § 64.1200(f)(5), (15), applies only to the NDNC claims.  Its argument that cell phone users are not "residential telephone

subscribers" applies to the NDNC and IDNC claims. Its arguments that proving the NDNC and IDNC claims requires individualized, fact-intensive inquiries unsuitable for class certification apply, respectively, to the NDNC and IDNC claims. Its argument that it took required steps to ensure compliance with the NDNC and IDNC rules and that any calls in violation of those rules were in error applies to the NDNC and IDNC claims, under different regulatory provisions. See 47 C.F.R. § 64.1200(c)(2)(i), (d).

Moreover, some of those defenses apply differently (or with different force) even among class members within each category of claim. For example, as HelloFresh acknowledges, its arbitration and class-action waiver defense arguably applies more strongly to class members who signed up for HelloFresh after it added those provisions to its terms and conditions in February 2017 than to those who signed up before. As another example, HelloFresh's contention that cell phone users do not qualify as "residential telephone subscribers" applies only to class members who received calls on cell phones -- not those who received calls on landlines. As a third example, HelloFresh's "established business relationship" argument does not apply to NDNC class members who terminated their subscriptions at least eighteen months before receiving the calls. 47 C.F.R. § 64.1200(f)(5).

Thus, the district court was confronted with a matrix of claims having different elements and confronting different arrays

of defenses. And at least some of these differences are significant in the sense that they go to "the heart of the litigation." <u>Cohen</u>, 16 F.4th at 946 (quoting <u>Matamoros</u>, 699 F.3d at 138). Simply put, some subgroups of the class could easily lose even as others win.

Of course, sometimes differences in elements or defenses that appear significant on their face may be rendered insignificant in the context of a particular set of facts. For example, class members with an NDNC claim must prove they are on the NDNC list, while class members with an IDNC claim must prove they are on HelloFresh's internal do-not-call list. Although these are different elements, they may not be significant enough to require separate representation given the lack of any evidence that HelloFresh failed to honor its obligation to keep an internal list and the possibility that it would be precluded from gaining any litigation advantage by failing to do so. As a second example, HelloFresh's argument that cell phone users are not "residential telephone subscribers" runs headlong into the FCC's express statements to the contrary. 18 FCC Rcd. 14014, 14039-40 (2003); <u>see, e.g.</u>, <u>Hodgin</u> v. <u>Parker Waichman LLP</u>, No. 3:14-CV-733, 2015 WL 13022289, at *3 (W.D. Ky. Sept. 30, 2015) ("[T]he FCC has been clear in interpreting 'residential subscriber' to include cell phones."). So we do not hold that it would be an abuse of

discretion to find that cell phone users and landline users could
be adequately represented by the same representatives and counsel.

On the other hand, some of the differences are, even in
context, too significant to leave the equitable apportionment of
a common fund to a court's discretion uninformed by arm's-length
negotiation between separately represented groups.  Most glaring
is the example provided by the Auto-Dialer claim with its unique
element requiring plaintiffs to prove that an "automatic telephone
dialing system" was used.  It seems clear that the Auto-Dialer
claims are incompatible with the Supreme Court's opinion in
Facebook, Inc. v. Duguid, 141 S. Ct. 1163 (2021), because the
devices used to make HelloFresh's calls did not "have the capacity
either to store a telephone number using a random or sequential
generator or to produce a telephone number using a random or
sequential number generator," id. at 1167.  McDonald argues as
much; HelloFresh concedes that "McDonald's position is consistent
with HelloFresh's"; and plaintiffs' only rejoinder is that perhaps
HelloFresh's contractors did use random or sequential number
generators.  But the record is devoid of support for this
speculation, despite plaintiffs' assertion that they have a "clear
view of the strength and weaknesses" of their claims after engaging
"in significant discovery" that produced "over 20,000 pages of
documents."  So we think it hardly clear-cut that counsel

- 18 -

representing class members with non-Auto Dialer claims would not argue that those persons should receive more of the $14 million.

Plaintiffs nevertheless contend that Duguid is largely irrelevant to our inquiry because the parties in this case agreed on the class settlement before Duguid was decided. Hence, plaintiffs argue, one could not have relied on Duguid as a basis for thinking that the Auto-Dialer claims had no settlement value. But the unanimous result in Duguid was hardly a surprise. The Supreme Court granted certiorari and held a reasonably foreshadowing oral argument long before settlement negotiations in this case commenced. Facebook, Inc. v. Duguid, 141 S. Ct. 193 (2020) (granting certiorari on July 9, 2020); Transcript of Oral Argument, Facebook, Inc. v. Duguid, 141 S. Ct. 1163 (2021) (No. 19-511) (oral argument held on December 8, 2020). In addition, the timeline of events suggests that the actual decision in Duguid had very little, if any, impact on HelloFresh's valuation of the claims. Before Duguid was decided, HelloFresh was willing to pay $14 million to settle a basket of claims containing many Auto-Dialer claims. After Duguid was decided, the court's initial refusal to approve the settlement without a further concession by HelloFresh gave the company a chance to walk away from the deal or renegotiate a lower sum. Yet it was still willing to pay $14 million to settle the same basket of claims. That suggests

that HelloFresh's valuation of the Auto-Dialer claims was roughly constant before and after the Duguid decision came down.

Other significant differences among class members result from the way the class is defined. As HelloFresh points out, there is no viable NDNC claim for individuals with whom HelloFresh had an "established business relationship" at the time of the calls -- i.e., individuals who made a "purchase or transaction" with HelloFresh in the eighteen months preceding the calls and did not ask HelloFresh not to call them. 47 C.F.R. § 64.1200(f)(5), (15). This is especially pertinent in the context of this case, which centers on HelloFresh's campaign to "win back" former subscribers. It seems obvious that the NDNC claims of class members who received HelloFresh's calls within eighteen months after terminating their subscriptions (if those claims exist at all) are significantly weaker than the NDNC claims of those who terminated their subscriptions at least eighteen months before receiving the calls. But the class is defined to include both of these groups, and the settlement treats them no differently.

Similarly, the TCPA requires that an individual must have received "more than one telephone call within any 12-month period" to bring an IDNC claim. 47 U.S.C. § 227(c)(5). But the IDNC group comprises individuals who received "one or more calls," and the settlement does not distinguish between those who received

only one call and those who received multiple calls, despite the clear difference in claim value.

These significant differences between the claims of the various class members land this case quite far from Cohen, which involved a settlement regarding the gender ratios of Brown University's athletes.  In Cohen, we rejected objectors' arguments that an intra-class conflict between women's sports teams -- some of which had been demoted from varsity to club status, and others of which had retained varsity status -- required separate representation.  16 F.4th at 950.  Unlike here, the class members possessed the same claim with the same elements (the ratio of women's varsity athletes as compared to men's athletes was low enough to violate Title IX).  And, unlike here, compromising the remedy that could result from successful litigation (a requirement that Brown adjust the ratio of women's to men's varsity athletes) posed no significant potential for conflict.  The most significant potential conflict among class members concerned which teams Brown might elevate or demote -- a decision which no class members could claim to be able to dictate, and which was not within the purview of the settlement.  Id. ("Under the Joint Agreement, every varsity team, regardless of gender, played at Brown's pleasure . . . .").  So, for that reason, we found that "[t]he record simply does not suggest any reason to believe that the class representatives' negotiations were apt to be skewed in favor of reinstating certain

teams by jettisoning others." Id.  By contrast, here the class members possess claims having significantly different elements and facing significantly different defenses.  And each group has a legal basis for demanding more of the lump sum -- an issue squarely posed by the proposed settlement -- because each group has a claim for monetary damages (at least in theory) against HelloFresh.

At oral argument, counsel for HelloFresh contended that because the groups of class members "overlapped," their interests were more or less the same.  Imagine, for example, that every class member with an Auto-Dialer claim also had an NDNC claim.  In that scenario, the alleged worthlessness of the Auto-Dialer claims in light of Duguid would not be a good reason to depart from the common per-person payment of $100 called for by the proposed settlement.  So we asked counsel to submit letters pointing us to this overlap.  Letters were filed, but none supported the claim of any relevant overlap.  They purportedly showed that eight of the nine named plaintiffs had all three types of claims.  But they provided no evidence that this ratio extended to the rest of the class.  HelloFresh also pointed out that less than 10% of class members with an NDNC claim had landlines, suggesting that over 90% of those class members used cell phones and also have an Auto-Dialer claim.  But this is the wrong type of overlap; the relevant inquiry is how many class members with an (allegedly worthless)

Auto-Dialer claim also have an (allegedly more valuable) NDNC claim, not the other way around.

HelloFresh and plaintiffs finally contend that because each of the three types of claims faces significant obstacles, their values are roughly equal.  That is, they argue that the defenses HelloFresh raised to the NDNC and IDNC claims are on par with the Duguid defense to the Auto-Dialer claims.  But we do not think HelloFresh's other defenses are as definitive as the Duguid defense, which essentially extinguishes the value of the Auto-Dialer claims.  Plus, HelloFresh's continued willingness to pay $14 million to settle the entire bundle of claims runs counter to the notion that they are all as weak as the Auto-Dialer claims appear to be on the record as it now stands.

In any event, plaintiffs' and HelloFresh's attempts to convince us that the significantly different claims nevertheless have the same value largely miss the point.  In theory, in the absence of arm's-length negotiations by separately counseled representatives, a district court could try on its own to value each category of the significantly different claims as discounted by the risks posed by the significantly different defenses applicable to each claim.  This is what plaintiffs and HelloFresh ask us to do.  But we do not think that Rule 23 is intended to work in this manner -- at least beyond requiring the district court to determine whether it is clear-cut that the differences would

likely have no material effect on settlement value.  As described
above, Rule 23(e) imposes procedural requirements, including that
the settlement was the product of "arm's length" negotiation by
individuals "adequately represent[ing] the class," Fed. R. Civ.
P. 23(e)(2)(A)-(B), that are designed to provide "structural
assurance of fair and adequate representation" before the
settlement reaches the court for approval.  Cohen, 16 F.4th at 945
(quoting Amchem, 521 U.S. at 627).  And this "structural assurance"
includes negotiations among counsel for each group of class members
with materially differing interests as to how the proposed
settlement amount should be divided among those groups -- including
negotiations regarding the impact of significant differences on
the relative values of the claims.  Said differently, ensuring
that claims marked by significantly different elements or defenses
receive appropriate relative weight in a class settlement should
be done in the first instance through negotiations between
counseled representatives of the different groups of class
members, not by the district court, unless the appropriate relative
weight is clear-cut.  See Literary Works, 654 F.3d at 253 ("We
know that Category C claims are worth less than the registered
claims, but not by how much.  Nor can we know this, in the absence
of independent representation.").  This procedural safeguard
"serve[s] to inhibit appraisals of the chancellor's foot kind
-- class certifications dependent upon the court's gestalt

- 24 -

judgment or overarching impression of the settlement's fairness." Amchem, 521 U.S. at 621.

To summarize, we find that the class as certified consists of class members with claims having significantly different elements and facing some very different defenses. Furthermore, we cannot say that the relative values of all of those different claims are sufficiently clear-cut so as to enable a court to approve a proposed apportionment of a common fund among the claimants in the absence of any informed arm's-length negotiation. Given these findings, the district court lacked the requisite basis for certifying the settlement class and approving the allocation of the $14 million among class members as fair, reasonable, and adequate.[1]

None of this is to say that a settlement like the proposed settlement cannot be approved. Arms-length negotiators might assess the differences in claim value as too insignificant to warrant the delay, expenses, and risk of foregoing a global settlement. Such a conclusion put forward collectively by counsel for each distinct group would provide a structural assurance of adequacy and fairness that is now missing. And the district court

---

[1] We do not address in this opinion a subject not raised by the parties -- the extent to which a class or classes may be certified for litigation rather than settlement. Nor do we opine on the precise number of subclasses that would need to be represented in concluding a lump-sum settlement of the present multi-claim class.

would have a significantly more developed record upon which it can exercise its discretion under Rule 23(e).

### B.

McDonald also challenges the incentive awards the settlement provides for the named plaintiffs. The district court approved awards between $2,000 and $10,000 apiece for the named plaintiffs. McDonald argues that the Supreme Court banned such payments in two 19th-century decisions and that, in this case, the incentive awards make the named plaintiffs inadequate representatives of the class. Neither contention is availing. Because this issue will undoubtedly arise in the course of any attempt to negotiate a new settlement on remand, we address it now.

### 1.

We begin by considering whether the Supreme Court has already rejected incentive awards for named plaintiffs in Rule 23 class actions. It has not.

The Supreme Court did hold, well before the advent of Rule 23, that a court cannot allow a "creditor, suing on behalf of himself and other creditors" to recover "personal services and private expenses" out of a common fund. Internal Imp. Fund Trs. v. Greenough, 105 U.S. 527, 537 (1881); see also Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116, 122 (1885). McDonald argues that we should apply these late-19th-century cases regarding

creditor lawsuits over mismanagement of a fund to modern-day class actions under Rule 23, thereby categorically prohibiting incentive awards for class representatives.

McDonald faces an uphill battle.  Courts have blessed incentive payments for named plaintiffs in class actions for nearly a half century, despite Greenough and Pettus.  See 5 Rubenstein, supra, at §§ 17:2, 17:4 (describing the history of modern incentive awards and explaining that Greenough "seems distant in both time and fact").  Two of our sister circuits have distinguished Greenough and declined to categorically prohibit incentive payments.  Melito v. Experian Mktg. Sols., Inc., 923 F.3d 85, 96 (2d Cir. 2019); In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 571–72 (7th Cir. 1992).

The Eleventh Circuit (in somewhat of an about-face) did recently bite on the Greenough argument.  Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1257 (11th Cir. 2020); but see Muransky v. Godiva Chocolatier, Inc., 922 F.3d 1175, 1196 (11th Cir. 2019), reh'g granted by, vacated by, 939 F.3d 1279 (11th Cir. 2019) (rejecting the same argument).  It stated that class-action incentive awards were "roughly analogous" to the payments for personal services in Greenough.  Johnson, 975 F.3d at 1257.

We do not think the situations sufficiently analogous.  In Greenough, a creditor's lawsuit against trustees in charge of managing a common fund, the Supreme Court's concern was that "[i]t

would present too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interest of creditors, and that perhaps only to a small amount, if they could calculate upon the allowance of a salary for their time and of having all their private expenses paid." Greenough, 105 U.S. at 538.  Said differently, the Court was concerned that such awards would induce creditors to interfere with the management of funds that had already been entrusted to trustees charged with fiduciary duties to act in the best interests of the creditors.

That is a different rationale than the one McDonald attributes to Greenough: "ensuring that named plaintiffs will actually represent the interests of the class in whose name they sue."  Greenough was concerned with a creditor's relationship vis-à-vis the trustees, not the other creditors.  Moreover, Rule 23(e) ensures that incentive payments will not result in unfair settlements by requiring that any settlement be "fair, reasonable, and adequate," taking into account whether "the class representatives . . . have adequately represented the class" and whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2); see Johnson, 975 F.3d at 1266–67 (Martin, J., dissenting).  And courts routinely enforce this requirement with regard to incentive payments specifically. See, e.g., Continental Illinois, 962 F.2d at 571–72 (upholding

denial of $10,000 award to named plaintiff); Schneider v. Chipotle
Mexican Grill, Inc., 336 F.R.D. 588, 602-03 (N.D. Cal. 2020)
(denying request for incentive awards under circumstances of
case); In re Puerto Rican Cabotage Antitrust Litig., 815 F. Supp.
2d 448, 469 (D.P.R. 2011) (reducing incentive award from amount
requested to reflect named plaintiffs' actual participation).

In addition, whereas in Greenough the Court wished to
prevent "intermeddl[ing]" with fund management, Rule 23 is
designed to encourage claimants with small claims to vindicate
their rights and hold unlawful behavior to account. See Smilow v.
Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 41 (1st Cir. 2003) ("The
core purpose of Rule 23(b)(3) is to vindicate the claims of
consumers and other groups of people whose individual claims would
be too small to warrant litigation."); Bais Yaakov of Spring Valley
v. ACT, Inc., 798 F.3d 46, 49 (1st Cir. 2015) (noting that, through
class actions, "Congress has chosen to empower citizens as private
attorneys general to pursue claims for well-defined statutory
damages"). But Rule 23 class actions still require named
plaintiffs to bear the brunt of litigation (document collection,
depositions, trial testimony, etc.), which is a burden that could
guarantee a net loss for the named plaintiffs unless somehow fairly
shifted to those whose interests they advance. See Continental
Illinois, 962 F.2d at 571. In this important respect, incentive
payments remove an impediment to bringing meritorious class

actions and fit snugly into the requirement of Rule 23(e)(2)(D) that the settlement "treats class members equitably relative to each other."

Accordingly, we choose to follow the collective wisdom of courts over the past several decades that have permitted these sorts of incentive payments, rather than create a categorical rule that refuses to consider the facts of each case.

### 2.

McDonald also claims that the presence of incentive payments in this case created a conflict of interest that rendered the named plaintiffs inadequate representatives of the class. This contention is unavailing. McDonald presents little, if any, case-specific analysis for concluding that the form or substance of the incentive payments called for by the proposed settlement prevented the named plaintiffs from adequately representing the class. Instead, her argument relies primarily on a presumption that incentive awards inherently cause class representatives to sell out the class. For all the reasons already described, we reject McDonald's contention that incentive payments are categorically improper. And we otherwise see no basis in the record to conclude that the district court abused its discretion in entertaining the approval of incentive payments in this case.

We also note that McDonald's argument might be said to apply similarly to attorneys' fees, yet McDonald does not suggest

that the payment of a fee to class counsel out of the settlement proceeds raises a conflict that categorically bars such payments. In either instance, a categorical prohibition on payments to those who make a class recovery possible would likely work to the disadvantage of those who might have otherwise benefited by a class recovery.

### III.

For the foregoing reasons, we <u>vacate</u> the district court's approval of the proposed settlement and <u>remand</u> for further proceedings consistent with this opinion. Costs are taxed in favor of the appellant Sarah McDonald and against appellees, jointly and severally.